**SOLO CUP COMPANY,**
**Plaintiff-Appellant,**

v.

**FEDERAL INSURANCE COMPANY,**
**Defendant-Appellee.**

No. 79–1528.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 8, 1979.

Decided April 11, 1980.

Rehearing Denied May 16, 1980.

1180

Shayle P. Fox, Chicago, Ill., for plaintiff-appellant.

John E. Guy, Abramson & Fox, Chicago, Ill., for defendant-appellee.

Before PELL and BAUER, Circuit Judges, and DUMBAULD, Senior District Judge.[*]

PELL, Circuit Judge.

This is an appeal by the plaintiff Solo Cup Company (Solo) from a judgment in favor of the defendant, Federal Insurance Company (Federal). Jurisdiction is based on diversity of citizenship. The district court concluded that the law of Illinois governed substantive questions, and the parties do not challenge this determination on appeal. The principal issue presented for review is whether the lower court erred in holding that there was a lack of coverage under an insurance policy for sums paid in settlement of an employment discrimination action brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17 (1970 & Supp. II 1972).

### I.

On January 24, 1974, Federal issued an "Umbrella Excess Liability Policy" to Solo which imposed both indemnity and defense obligations upon the insurer. The relevant indemnity provisions obligated Federal to secure Solo against any "ultimate net losses"[1] which it might suffer as a result of "occurrences" of covered "personal injuries."

> An "occurrence" was defined as
>
> an accident or happening or event or a *continuous or repeated exposure to conditions which unexpectedly and unintentionally* results in personal injury . . . . All such exposure to substantially the same conditions existing at or emanating from one premise or location shall be deemed one occurrence.

Policy Definition 5. (Emphasis supplied.)

The term "personal injuries" was broadly defined in Policy Definition 2 to include

---

[*] Senior District Judge Edward Dumbauld of the Western District of Pennsylvania is sitting by designation.

1. Solo had no underlying insurance and Federal's liability, if found to exist, could be subject to a deductible of $10,000.

bodily injury, mental injury, mental anguish, shock, sickness, disease, disability, false arrest, false imprisonment, wrongful evictions, detention, malicious prosecution, *discrimination*, humiliation; also libel, slander or defamation of character or invasion of rights of privacy. . . .

(Emphasis supplied.)

Finally, covered "ultimate net losses" included not only sums the insured became obligated to pay through adjudication or compromise, but also

sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for . . . lawyers . . . and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder. . . .

Policy Definition 6.

In addition to the inclusion of defense costs as a part of the ultimate net loss for which Solo was entitled to indemnity, however, there had been added to the policy "Endorsement No. 1—Supplementary Payments," which imposed the following separate and distinct defense obligation upon Federal:

It is agreed that, with respect to any occurrence not covered by the underlying policies . . . but covered by the terms and conditions of this policy . . . the company shall:

(A) Defend any suit against the insured alleging such injury . . . and seeking damages on account thereof, even if such suit is groundless, false or fraudulent. . . .

While the policy was in force, Anne Willard, an employee in Solo's Atlanta, Georgia, facility, filed a charge with the Equal Employment Opportunity Commission (EEOC), in which she alleged that Solo's failure to promote her was sexually discriminatory. Thereafter, on May 6, 1976, the EEOC filed against Solo in the Northern District of Georgia an action seeking broad

compensatory and injunctive relief for an alleged class of female discriminatees. The complaint included allegations of intentional discrimination.

Separately, on November 16, 1976, the General Services Administration (GSA) conducted an on site review of Solo's Grandview, Missouri, facility to determine whether Solo, as a government contractor, had complied with the mandate of Executive Order 11246 and its implementing regulations to refrain from employment discrimination. This compliance review resulted in an administrative allegation that Solo had discriminated against seventy-two female employees with respect to initial job placement. While the GSA proposed that Solo pay the alleged discriminatees $266,667 in backpay and interest as a basis for conciliation, the record does not indicate that any debarment proceedings have been commenced against Solo to date to enforce its alleged liability.

In a letter dated February 17, 1977, Solo advised Federal of both the EEOC action [2] and the GSA compliance review, and asserted that both matters were within the coverage of the policy. Federal immediately disclaimed coverage as to the EEOC matter, and thereafter asserted in its answer to plaintiff's amended complaint below that the GSA review was merely investigative and that Federal therefore had no obligation to defend.

On May 4, 1977, Solo advised Federal of its intention to settle the EEOC litigation, and subsequently entered into a consent decree in the Northern District of Georgia. Pursuant to the terms of the decree, Solo paid the charging party, Anne Willard, $25,000. The decree recited, however, that its entry did not "constitute or operate as an acknowledgement or admission" that Solo had violated Title VII. *Equal Employment Opportunity Commission v. Solo Cup Company*, No. C 76–806 (N.D.Ga. May 31, 1977).

Solo then commenced this action seeking indemnity for legal fees, costs, and sums paid in settlement of the EEOC action, for

---

**2.** No issue is raised regarding the timeliness of the notice to Federal.

legal fees paid in conjunction with the GSA review, and additionally a declaration of its right to indemnity for any sums paid as a result of the administrative claim of back-pay liability.

The district court granted Federal's motion for summary judgment as to all issues. The court reasoned that Federal could have no indemnity or defense obligations toward Solo with respect to the EEOC action because the EEOC complaint contained allegations of intentional discrimination which were inconsistent with the policy definition of an insured "occurrence." With respect to coverage of the claims related to the GSA review, the court held that the insurer had no duty to defend against administrative procedures, and that the question of whether any claim resulting from the GSA review could constitute an insured occurrence did not present an actual controversy within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201, or Article III of the Constitution, U.S.Const. art. III, § 2.

## II.

A. The EEOC Action

█ The contract of insurance at issue in this litigation imposed an absolute duty upon Federal to provide a defense in any actions filed against Solo charging the occurrence of an injury within the coverage of the policy. It is well settled under the law of Illinois that

[this] duty to defend extends to cases where the complaint alleges several causes of action or *theories of recovery* against an insured, one of which is within the coverage of the policy while others [might] not be.

*Maryland Casualty Co. v. Peppers*, 64 Ill.2d 187, 355 N.E.2d 24, 28 (1976) (emphasis supplied). An insurer may not refuse the tendered defense of an action unless a comparison of the policy with the underlying complaint shows on its face that there is no potential for coverage. *Weed v. Ohio Farmer's Insurance Co.*, 53 Ill.App.3d 826, 11 Ill.Dec. 564, 566, 368 N.E.2d 1310, 1312 (1977). In making the comparison any am-

biguous or equivocal expressions in the policy will be strictly construed against the insurer. *Pioneer Insurance Co. v. Alliance Insurance Co.*, 374 Ill. 576, 586, 30 N.E.2d 66, 71–72 (1940). *See generally* 7C Appleman, *Insurance Law and Practice* § 4683 (1979).

Solo contends, however, that even if Federal's refusal to provide a defense was proper under the above described duty of defense and was therefore not a breach of the agreement contained in Endorsement 1 of the policy, quoted *supra*, Federal may nevertheless be required to indemnify Solo for the $25,000 paid in settlement of the underlying action if, on remand, a trier of fact concludes that Solo's actions toward Anne Willard were not "intentional" within the meaning of the policy. Solo bases this argument on the premise that because the duties of indemnity and defense contained in the insurance contract are independent covenants, the mere fact that one covenant has not been breached does not preclude an opposite conclusion with respect to the remaining covenant.

█ While it is true that the obligations of indemnity and defense contained in the contract are independent of each other, we are unable to agree that Federal may, absent the existence of a duty of defense regarding the EEOC claim, have any obligation of indemnity for the sums paid in settlement of that claim. This follows from the fact that under Illinois law, a duty to defend such as is embodied in this contract of insurance, is broader than a general duty to indemnify for liabilities, fees, and costs. *Colton v. Swain*, 527 F.2d 296, 301–302 (7th Cir. 1975) (applying Illinois law).

█ The defense obligation is triggered when the insured tenders the defense of an action against it which is *potentially* within the policy coverage. By contrast, the indemnity obligation at issue here matures only when the insured becomes obligated to pay by reason of liability imposed by law. An insurer whose policy has an assumption of defense clause will therefore frequently have an independent duty to defend actions

which will not ultimately result in an obligation to indemnify, either because the insured was not adjudged liable or because the facts were resolved in such a way as to bring the matter within a policy exclusion.[3] Conversely, litigation over the independent duty to indemnify will result only: (1) when the insurer has already defended the action under a reservation of rights, the insured has been found liable, and the insurer thereafter contests the coverage of the policy; or (2) when the policy contains no defense clause. If the broader duty to defend has not been triggered, it is because the underlying action is not potentially within the coverage of the policy, and there could be, as a practical matter, no duty to indemnify in such a situation.

■ Therefore, because Federal refused to assume the defense of the EEOC action, our analysis here necessarily focuses on whether that refusal was a breach of the duty of defense covenant contained in Endorsement 1. In the event it was not a breach of that covenant of the insurance contract, our inquiry is at an end. If, however, we determine that the duty of defense was violated, the applicable Illinois law holds that the insurer is estopped to deny coverage, *Aetna Casualty & Surety Co. v. Coronet Insurance Co.*, 44 Ill.App.3d 744, 3 Ill.Dec. 371, 374, 358 N.E.2d 914, 917 (1976), and provides for the following broad measure of damages to the insured: (1) the costs of defending the suit; (2) the amount recovered from the insured, either by way of judgment or settlement; and, (3) any additional damages caused by the insurer's breach of contract, *see, e. g., J. L. Simmons Co., Inc. v. Fidelity and Casualty Co.*, 511 F.2d 87, 90 (7th Cir. 1975) (applying Illinois law); *Weed. v. Ohio Farmer's Insurance Company*, 53 Ill.App.3d 826, 11 Ill.Dec. 564, 567, 368 N.E.2d 1310, 1313 (1977); *Sims v. Illinois National Casualty Co.*, 43 Ill.App.2d

184, 193 N.E.2d 123, 127 (1963); *see generally* 7C Appleman, *Insurance Law and Practice* § 4683 (1979), again obviating any additional inquiry into the duty to indemnify.

Federal contends that its refusal of the tendered defense[4] was proper because the underlying EEOC complaint against Solo included the following allegation:

> Since July 2, 1965, and continuously up until the present time, Defendant Company has *intentionally* engaged in unlawful employment practices at its Atlanta, Georgia facility, in violation of certain provisions of Title VII. These violations include, but are not limited to, the following:
>
> 1. Failing and refusing to promote women based on sex;
>
> 2. Compensating women at a lower rate than men for substantially the same work;
>
> 3. Maintaining job classifications segregated on the basis of sex;
>
> 4. Having different terms and conditions of employment for women based on sex; and
>
> 5. Discharging women in retaliation for exercising protected rights under Title VII.

(Emphasis supplied).

■ Reasoning that the extent of its obligation to defend should be measured by a comparison of the policy and the underlying complaint, Federal then argues that the act of the insured which is the subject of the suit must be an "occurrence." Because the policy defines an "occurrence" insofar as is relevant to this litigation as one which "*unintentionally* results in personal injury . . . ." (emphasis supplied), Federal therefore insists that the inclusion of the word "intentionally" in the underlying complaint negated coverage and relieved it of

---

3. The proper course of action for an insurer who disputes coverage, but nevertheless has an obligation to defend an action is set forth in *Maryland Casualty Co. v. Peppers*, 64 Ill.2d 187, 355 N.E.2d 24 (1976). The insurer should either seek a declaration of its rights in an independent action, or should defend under a reservation of rights, which it may do by as-

suming the defense, or, if necessary to avoid a conflict of interest, by means of independent counsel retained to represent the interests of the insured.

4. Federal has not raised an issue as to the adequacy of the tender.

its duty to provide a defense. We do not agree.

While it is true that an insurance company's obligation to defend depends upon the underlying complaint against its insured, this obligation, as noted previously, is present whenever there appears to be a *potential* for coverage under the policy. *Colton v. Swain*, 527 F.2d 296, 302 (7th Cir. 1975) (applying Illinois law); *Maryland Casualty Co. v. Peppers*, 64 Ill.2d 187, 355 N.E.2d 24 (1976); *Weed v. Ohio Farmer's Insurance Co.*, 53 Ill.App.3d 826, 11 Ill.Dec. 564, 368 N.E.2d 1310 (1977). Where, under the allegations of the pleadings against the insured, "an insured's liability exists on one *theory* as well as another and one of them brings the liability within coverage, we think the insured may avail himself of the insurance protection." *United States Steel Corporation v. Hartford Accident & Indemnity Co.*, 511 F.2d 96, 99 (7th Cir. 1975) (emphasis supplied) (applying Illinois law). Especially since the advent of notice pleading, in a case where there is doubt as to whether a theory of recovery within the policy coverage has been pleaded in the underlying complaint, the insurer must defend, and its defense obligations will continue until such time as the claim against the insured is confined to a recovery that the policy does not cover. *Carboline Company v. Home Indemnity Company*, 522 F.2d 363, 366–367 (7th Cir. 1975) (analyzing Illinois law).

To hold otherwise would be to place upon the insured the burden of demonstrating in advance of the underlying litigation which of the competing theories of recovery against it was applicable for purposes of insurance, thereby frustrating one of the basic purposes of such a clause in the insurance contract—protection of the insured from the expenses of litigation. *Aetna Casualty & Surety Co. v. Coronet Insurance Co.*, 44 Ill.App.3d 744, 3 Ill.Dec. 371, 358 N.E.2d 914 (1976).

The underlying complaint filed against Solo by the EEOC seemingly alleges a full panoply of offenses under Title VII. Although based upon a promotional claim filed by a single employee, it includes class allegations [5] of sex based discrimination in compensation, promotional opportunities, and job placement, as well as general allegations of discrimination in terms and conditions of employment.

A Title VII plaintiff may establish a violation under either the "disparate treatment" or the "disparate impact" theory. As the Supreme Court observed in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335–36 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d 396 (1977):

> "Disparate treatment" . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. . . .
>
> Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. . . .

*Id.*

In our opinion, the allegations in the underlying EEOC complaint were so general that the EEOC would in all likelihood have been permitted to proceed under either theory. An analysis of the question of whether a disparate treatment claim would have been within the coverage of the policy necessitates an examination of the burdens of proof articulated for that type of action in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), and its progeny. In order to establish a prima facie case under

---

5. The EEOC complaint was filed before the decision in *EEOC v. D. H. Holmes Co., Ltd.*, 556 F.2d 787 (5th Cir. 1977), *cert. denied*, 436 U.S. 962, 98 S.Ct. 3082, 57 L.Ed.2d 1129 (1978). In that case, the Fifth Circuit held that when the

EEOC alleges class discrimination and seeks relief for "those persons adversely affected," the suit is a class action and the EEOC must comply with the requirements of Rule 23.

the disparate treatment theory, a plaintiff is required to show the following: (1) that he or she belongs to a protected group under the statute; (2) that he or she applied and was qualified for the job or promotion for which the employer was considering applicants; (3) that despite his or her qualifications, the applicant was rejected or was not promoted; and (4) that after the plaintiff's rejection, the employer continued to seek or consider applicants of the plaintiff's qualifications.

■ In *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), the Court defined the exact scope of the prima facie case, noting that it was not the equivalent of a finding of discrimination, but rather raises an inference that the defendant's acts, if not otherwise explained, were more likely than not based on a consideration of impermissible factors. The burden that shifts thereafter to the employer is consequently one of articulating a legitimate, nondiscriminatory reason for its employment decision. *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978). If the employer meets this burden, the plaintiff will then be given an opportunity to introduce evidence that the employer's proffered justification is a mere pretext for discrimination.

■ What emerges from an overview of the above burdens is that proof of discriminatory motive is critical in a disparate treatment action. *International Brotherhood of Teamsters v. United States, supra*, 431 U.S. at 335–36 n.15, 97 S.Ct. at 1854 n.15. The establishment of a case under *McDonnell Douglas* is equated with proof of motive because

> we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, whom we generally assume acts only with *some* reason, based his

decision on an impermissible consideration.

*Furnco Construction Corp. v. Waters, supra,* at 577, 98 S.Ct. at 2950.

■ While the concepts of motive and intent are not identical, we think in the narrow context of determining the scope of coverage under this insurance policy, there is a similarity. The policy definition of an insured occurrence would extend only to a liability incurred by reason of Solo's *unintentionally* exposing women to discriminatory conditions. The extent of this coverage is therefore inconsistent with liability predicated on the disparate treatment theory since such a liability would necessarily involve a determination that Solo acted with a discriminatory motive or purpose.

■ We reach the opposite conclusion, however, with respect to the disparate impact theory, which is employed to analyze the validity of employment practices which are fair and neutral in form, but discriminatory in operation. The basic legal standards utilized in a disparate impact analysis were developed in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and amplified in *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Proof of motive is not required. *International Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 335–36 n.15, 97 S.Ct. at 1854 n.15.

■ In order to make out a prima facie case of discrimination under the disparate impact theory, the plaintiff is required to show only that the employer utilized a facially neutral criterion which resulted in selecting applicants for hire or promotion in a significantly discriminatory pattern. Once the employment standard is so shown to be discriminatory in effect, the employer then must meet the burden of showing that its standard bears a manifest relation to the job in question. If the employer can demonstrate the job relatedness of its standard, the plaintiff may then show that other selection devices without a similarly discriminatory effect will also serve the employer's

interest in maintaining an efficient workforce.

Solo contended at argument that the basis of the underlying claim against it was in fact a disparate impact claim based on its policy of requiring sales experience as a prerequisite for certain promotions. This policy, according to Solo's summary of the EEOC's position in the underlying action, disqualified disproportionate numbers of women, who, as a group, tended not to have the required experience.

 While there is nothing in the record below to enable us to make a clear determination of whether the EEOC's complaint was in fact aimed at such a policy, we cannot, as noted previously, hold that the EEOC complaint did not contain a potential disparate impact claim. Since disparate impact liability does not require proof of discriminatory motive, and since Federal has, moreover, conceded that the policy covers at least some types of disparate impact claims,[6] we therefore hold that the disparate impact claim which could have been proved under the allegations of the underlying complaint was a claim potentially within the coverage of the policy. Consequently, under Illinois law, Federal has breached its duty to defend its insured in the action. *See generally Maryland Casualty Co. v. Peppers, supra*, 355 N.E.2d at 28.

 The final issue to be considered with respect to the EEOC claim is whether our construction of the policy to include coverage of disparate impact liability would, as Federal contends, render the insurance contract violative of the public policy against employment discrimination embodied in Title VII. It is well settled that "[a] contract of insurance to indemnify a person for damages resulting from his own intentional misconduct is void as against public policy and the courts will not construe a contract to provide such coverage."

---

**6.** Although it might seem that Federal's argument carried to its logical extreme would result in its purported coverage of "discrimination" as being without any real meaning, Federal argues otherwise, pointing out that there are instances of vicarious liability imposed by Title

*Industrial Sugars, Inc. v. Standard Accident Insurance Co.*, 338 F.2d 673, 676 (7th Cir. 1964). This rule is based on the simple principle long ago stated by Judge Cardozo, that "no one shall be permitted to take advantage of his own wrong. *Messersmith v. American Fidelity Co.*, 232 N.Y. 161, 133 N.E. 432 (1921). Placing a limitation on the clear meaning of an insurance contract due to policy considerations, is, however, a restraint on the rights of private parties to fashion their own contract, *Union Camp Corp. v. Continental Casualty Co.*, 452 F.Supp. 565, 568 (S.D.Ga.1978), and is a step which courts have taken only where contracts were argued to extend coverage to the knowledgeable and intentional, or the criminal wrongdoer. *Hartford Life Insurance Co. v. Title Guarantee Co.*, 520 F.2d 1170 (D.C.Cir.1975); 1 *Couch on Insurance* 2d § 1.36 (1959 & Supp.1978).

Because we have construed the policy to exclude coverage of disparate treatment liabilities, we do not consider whether the degree of motive which must be proved in that type of action would be equivalent to a knowledgeable and intentional wrong such as would void policy provisions purporting to cover those claims.

 With respect to the coverage of disparate impact liabilities, there is clearly no basis for voiding or limiting the contract. An insured may incur liability or become involved in litigation under that theory as a result of its utilization of any of a variety of seemingly neutral selection criteria. We note our agreement with the opinion of the Court of Appeals for the Sixth Circuit in *L'Orange v. Medical Protective Company*, 394 F.2d 57, 60 (6th Cir. 1968), where that court, interpreting Ohio law, observed that "the violation of public policy is measured by the tendency of the contract to injure the public good rather than by actual injury under the particular circumstances."

---

VII, caused by the acts of others, which liability is therefore unintentional as to the insured. We regard this approach as so narrow as to leave little real meaning to the purported coverage.

We do not think that allowing an employer to insure itself against losses incurred by reason of disparate impact liabilities will tend in any way to injure the public good, which we equate here with that equality of employment opportunity mandated by Title VII. To the contrary, the fact of insurance may be helpful toward achieving the desirable goal of voluntary compliance with the Act. The statistical proofs in disparate impact actions, most particularly those involving employment testing, have become increasingly complex and employers now often retain batteries of experts to validate their selection criteria. Such complex analyses of employment standards, while apparently necessary in order to ensure that an employer's policies do not needlessly place a stumbling block in the way of women or minorities, may well become, as a practical matter, beyond the financial capabilities of all but the largest employers. The involvement of insurance in the field might, however, ease the burden on smaller employers by making claim prevention services available on a cost effective basis to help employers evaluate their employment standards. Workmen's compensation insurers have, by way of analogy, no doubt helped prevent numerous employee injuries, and it is not undesirable, nor inconceivable, that discrimination insurers might aid in preventing the injury of discrimination as well.

▆▆ Because we have held that Federal breached its duty to defend its insured in an action which was potentially within the coverage of its policy, and because there is no public policy reason for limiting the contract, Solo is entitled under Illinois law to damages in the amount of the costs and fees involved in defending the action, and the sums paid in settlement of the claim, less the policy deductible.

### B. The GSA Review

Solo also seeks a declaration that it is entitled to have Federal provide a defense with respect to the allegations of sex discrimination made by the GSA in its compliance review. It additionally seeks indemnity for the $3,750 in legal fees and costs already expended during the review, and further seeks a declaratory judgment that any sums it becomes obligated to pay as backpay to female employees in the facility which was the subject of the GSA review will be within the indemnity coverage of the policy.

▆▆ Dealing with these contentions in order, our review of the record does not indicate that Federal's defense obligations have been triggered by the events to date surrounding the compliance review. Our determination rests upon the fact that the only "claim" which has so far been made against Solo is an administrative *proposal*[7] that Solo pay some $266,667 in allegedly due backpay as a *basis for conciliation*. Solo, has, however, refused to conciliate upon this basis. Moreover, this excerpt from a letter from Solo to Federal dated May 19, 1977, is itself illustrative of the remote and indeed speculative nature of any claims which might be made against Solo:

> Solo Cup Company denies that it is guilty of any such [backpay] deficiency because there are a number of available defenses

---

7. In the GSA matter there are no adjudicatory proceedings taking place in any forum; therefore we leave for another day the question of whether the duty to defend imposed by the provisions of the policy is necessarily confined to judicial proceedings. We do note, however, that the duty to defend in Endorsement 1 obligates the insurer to "defend any *suit* against the insured." The indemnity provisions of the policy, by contrast, obligate the insurer to indemnify Solo for all sums paid by reason of liability imposed "by law." In light of this language in the indemnity provisions, we think that the duty to defend "suits" might in some circumstances be triggered by adjudicatory proceedings before an administrative body. This conclusion follows from the fact that under Illinois law, the duty to defend, while independent of the duty to indemnify, is the broader of the two. Further, the word "suit" contained in the defense provision is ambiguous, *see, e. g.*, Webster's New Unabridged International Dictionary (2d ed.) (defining "to sue" as "to seek justice or right . . . by legal redress"), and must therefore be construed liberally in favor of the insured. *J. L. Simmons Co., Inc. v. Fidelity & Cas. Co.*, 511 F.2d 87, 90 (7th Cir. 1975).

to the allegation and in any event believes that the amount claimed is greatly exaggerated. As a result of refusing to conciliate this matter, *it is anticipated that some time in the future* there will be a hearing with respect to Solo's right to continue as a government contractor and there *might* be an action filed to seek backpay.

(Emphasis supplied.)

Because we have held that Federal's broad duty of *defense* has not yet been triggered, we must examine the question of whether Solo might be entitled to reimbursement of the $3,750 of fees and costs expended to date in conjunction with the review under the *indemnity* provisions of the policy. Because there have been no formal proceedings against Solo, and therefore no "liability imposed upon the Insured by law" as required by Paragraph 4 of the indemnity coverage, we hold that it is not so entitled at this time.

Finally, we are in full agreement with the district court that the question of whether Solo would be entitled to indemnity for sums paid to female employees in any actions which might be brought either to debar Solo as a federal contractor or to seek backpay for alleged discriminatees is not ripe for adjudication. The Declaratory Judgment Act, 28 U.S.C. § 2201, provides for a remedy only in cases of "actual controversy." The mere possibility that proceedings might be commenced against an insured regarding an act of the insured's as to which the insurer might contest coverage, is not sufficient to create a controversy within the meaning of either the Declaratory Judgment Act or Article III of the Constitution.

The district court erred, however, in granting the insurer's motion for summary judgment as to the GSA related allegations. The appropriate remedy where an action is found not to constitute a controversy is not judgment but dismissal. Fed. R.Civ.P. 12(h)(3).

Reversed and Remanded, for entry of a judgment on Count I and an order of dismissal on Count II consistent with this opinion. The judgment of this court shall include costs to the appellant.