509 So.2d 945 (1987)
RANGER INSURANCE COMPANY, a Foreign Corporation, Appellant,
v.
Bal HARBOUR CLUB, INC., Appellee.
No. 84-918.
District Court of Appeal of Florida, Third District.
June 9, 1987.
Joe N. Unger, Corlett, Killian, Hardeman, McIntosh & Levi, Miami, for appellant.
Mershon, Sawyer, Johnston, Dunwody & Cole and James M. McCann, Jr., Miami, for appellee.
Before SCHWARTZ, C.J., and BARKDULL, HENDRY, HUBBART, NESBITT, BASKIN, DANIEL S. PEARSON, FERGUSON and JORGENSON, JJ.

*946 ON REHEARING EN BANC
NESBITT, Judge.
While Ranger Insurance Company's (Ranger) motion for rehearing was pending, we requested supplemental briefs from the parties on whether public policy considerations prevents recovery by Bal Harbour Club, Inc. (Bal Harbour) on the insurance contract at issue in this case.[1] We subsequently granted Ranger's motion for rehearing en banc.[2] After reviewing the authorities and arguments of counsel, we conclude recovery should not be precluded by public policy, and Ranger, after accepting premiums, must provide coverage for a claim falling within the personal injury liability provision of the policy.
No Florida case has decided the precise issue considered in this case, namely, whether public policy prohibits recovery under an insurance contract for losses paid by an insured as a result of acts that amount to intentional discrimination.[3] There are some cases, however, which have allowed coverage for intentional acts and appear to support the result we reach here. For example, this court, in Hartford Fire Ins. Co. v. Spreen, 343 So.2d 649 (Fla. 3d DCA 1977), affirmed a judgment for an insured, finding coverage for damages which the insured had incurred as the result of an intentional assault and battery.
The Florida supreme court, in Everglades Marina, Inc. v. American E. Dev. Corp., 374 So.2d 517 (Fla. 1979), held that it is not contrary to public policy to allow third-party beneficiaries of an insurance policy to recover benefits for losses caused by an intentional, criminal act of the insured. We recognize that the holding was specifically limited to recovery by innocent third-party beneficiaries. The supreme court's concern for compensation to innocent third parties is, however, also a justification for the result we reach here. While the public policy of this state condemns intentional acts of discrimination, just as it does criminal acts, prohibiting insurance coverage for such discriminatory acts will have an adverse impact upon a competing public policy by frustrating recovery for damages suffered by the victims of such discrimination.[4] Since the insured benefits no more when payment is made directly from the insurer to the victim than when he is indemnified for a payment he makes to the victim himself, it makes little sense to prohibit such coverage and thereby frustrate the recovery of damages by innocent third parties.[5]
Other jurisdictions, when faced with the issue presented here, have generally avoided it. See Solo Cup Co., 619 F.2d at 1187 (since intentional discrimination was not covered by the contract of insurance, as coverage was limited to "occurrences" *947 which did not include intentional acts, the court did not consider whether public policy would have prevented coverage for the alleged acts of intentional discrimination); City of Greensboro v. Reserve Ins. Co., 70 N.C. App. 651, 321 S.E.2d 232, 236 (1984) (the court did not reach the merits of the insurer's argument that insurance against intentional acts of discrimination was against public policy because it could not determine from the record whether the alleged acts were of a discriminatory nature); School District No. 1, 650 P.2d at 936 n. 4, 946 (because the court concluded that intentional discrimination was excluded from coverage by the various insurance policies involved, it declined to decide whether intentional discrimination would be uninsurable as a matter of public policy). Dicta in City of Greensboro, however, does support our conclusion in the present case.
The [insurer] maintains that the ... claims are uninsurable, asserting that insurance against intentional acts of a discriminatory or unconstitutional nature is against public policy, and such insurance is therefore void. Although any contract of insurance contrary to public policy is invalid and unenforceable, ... we do not reach the merits of this issue. Although we do not believe these claims are uninsurable, it is impossible to determine from the record whether the [claims] are founded on acts of a discriminatory or unconstitutional nature.
321 S.E.2d at 236 (emphasis added) (citation omitted). In Union Camp Corp., 452 F. Supp. at 565, the district court was faced with the issue of whether "an insurance policy that insures an employer against losses resulting from racially discriminatory practices under Title VII and 42 U.S.C. § 1981 [is] violative of public policy[.]" 452 F. Supp. at 566. After reviewing the arguments presented on both sides of the issue, the court held against the insurance company, finding:
The proposition that insurance taken out by an employer to protect against liability under Title VII will encourage violations of the Act is based on an assumption that is speculative and erroneous. Defendant's [insurer's] conclusion is but an a priori response to the relation between violations of statutes forbidding discriminatory practices and the existence of insurance protecting against same. The argument assumes that employers would deliberately violate the law because their actions are protected by insurance.
.....
Continental and other insurers which have issued policies containing such clauses have not up to now conceived that they were violating public policy by writing insurance policies insuring against losses resulting from discriminatory employment practices. Neither Congress no EEOC has interdicted such contracts. Only the insurer of the policy sued on makes such a claim. Exercise of the freedom of contract is not lightly to be interfered with. It is only in clear cases that contracts will be held void as against public policy... . This is not one.
452 F. Supp. at 567-68 (citations omitted).[6]
In Harris v. County of Racine, 512 F. Supp. 1273 (E.D.Wis. 1981), however, the court held, in a 42 U.S.C. § 1983 action, that it is not against public policy for an insurer to provide a government entity with coverage for punitive damages awarded for an intentional act of racial discrimination. By necessary implication the case stands for the proposition that those same entities may, without offending public policy, insure against compensatory damages *948 awarded as a result of an intentional discriminatory act. The court emphasized the public policies favoring freedom of contract and enforcement of contracts according to their terms and noted the ease with which an insurer can exclude coverage for intentional acts of discrimination.
More than 70,000 claims of discrimination in employment were filed with the Equal Employment Opportunity Commission in 1983. See Complaints Statistical Reportings System, Fiscal Year 1984, Summary. In addition, unknown numbers of suits are filed each year alleging discrimination in housing, health services, access to public facilities and other areas. Some of these claims are founded and some are unfounded. The payment of a large award and imposition of attorney's fees in a discrimination case conceivably could cripple an employer financially or even put the offending company out of business. See Union Camp, 452 F. Supp. at 568. Employers and businesses must be permitted to take steps to protect themselves from these suits.[7]
Allowing recovery on the contract of insurance in the present case does not limit or infringe upon the constitutional rights of either party or the victims of the discrimination. Contrary to Ranger's contentions, allowing insurance coverage for acts that amount to discrimination does not validate or encourage such actions any more than allowing coverage for other wrongful acts encourages those actions. See Hartford Fire Insurance Co. (upholding summary judgment against insurance company on defendant-insured's third-party claim for coverage under policy for damages arising from his assault and battery on plaintiff-victim). Further, as Bal Harbour points out, the marketplace itself will discourage wrongful acts of discrimination. Since insurance companies have a strong interest in avoiding claims, an entity with a history of discrimination will be unable to procure coverage. In addition, insurers can contractually exclude coverage for damages arising from acts that amount to intentional discrimination. See Solo Cup; Union Camp; School District No. 1. Cf. City Council of Elizabeth v. Fumero, 14 N.J. Super. 275, 362 A.2d 1279, 1285 (1976) (insurer may contractually eliminate certain legal theories of recovery, such as civil rights actions under the federal statutes, from the protection provided by the policy). Finally, wrongdoers can be adequately punished under present law by the imposition of punitive damages, where appropriate, since it is against the public policy of this state to insure against such damages. See U.S. Concrete Pipe Co. v. Bould, 437 So.2d 1061, 1064 (Fla. 1983). Thus, the public policy of this state is adequately served by the marketplace and the present state of the law, which provide disincentives sufficient to discourage intentional discrimination. Consequently, prohibiting insurance coverage in discrimination actions is not necessary; likewise, enforcing such a prohibition would not be desirable from the standpoint of the victims of discrimination. Accordingly, the motion for rehearing en banc is denied.
Given the importance of the interests involved, we certify, pursuant to Article 5, section 3(b)(4), of the Florida Constitution, the following question as one of great public importance:
Does the public policy of Florida prohibit an insured from being indemnified for a loss resulting from an intentional act of religious discrimination?
SCHWARTZ, C.J., and HENDRY, HUBBART, BASKIN and JORGENSON, JJ., concur.
FERGUSON, Judge (dissenting).
The basic question presented by this appeal is not new  whether the public policy of this state should prohibit the enforcement of a general liability insurance contract to compensate a third party for damages arising from intentional and unlawful conduct of an insured where the persons harmed by the unlawful conduct were the *949 intended victims. The new element is that the unlawful and intentional wrong is a religious discrimination. In our view the nature of the unlawful conduct should not change the results.
This case commenced as an action by Phil and Rona Skolnick, who are Jewish, to recover against Bal Harbour Club, Inc. (Club) for damages caused by its acts of intentional religious discrimination.
In February, 1981, the Skolnicks purchased unimproved real property in the residential section of Bal Harbour, Florida. The property was subject to a deed restriction which prohibited use or occupancy "by anyone not a member of the Caucasian race, [or] anyone having more than one-fourth Hebrew or Syrian blood." The deed also provided, as a condition of transfer, that the seller could not convey the property to any person who was not at that time a member of the Bal Harbour Club, Inc. A "reverter clause" provided that violation of any covenant or restriction of the deed would cause the property to revert immediately to the grantor. Under the terms of the Club's charter and bylaws, in order to purchase property in the residential section of Bal Harbour the prospective buyer was required to apply and be accepted for membership into the Club.
Although the deed restriction precluding Jews from ownership of real property in the residential section of Bal Harbour lapsed in 1968, it is alleged that the requirement that property owners be members of the Club still operated effectively to preclude the Skolnicks from having unfettered ownership and use of real property in the residential section of Bal Harbour. The Skolnicks made an application for membership to the Club on March 16, 1981. Several months later the application was returned as "incomplete" and was not completed until January 18, 1982. The Skolnicks sued. The insurer undertook to represent the Club under a reservation of rights. A $25,000 settlement was negotiated with the Skolnicks which the Club is obligated to pay, and which the Club contends should be paid by the insurer as a covered claim. The insurer says the public policy prohibits enforcement of the contract on these facts.
The acts allegedly committed by the insured are prohibited by the Constitution,[1] statutes,[2] and ordinances,[3] and thus clearly run afoul of strong public policy. Further, the acts are the kind we think are not adequately deterred if they are held covered by a general liability policy of insurance.
The cases relied upon by the majority are distinguishable and even more comfortably support the insurer's argument. In Hartford Fire Ins. Co. v. Spreen, 343 So.2d 649 (Fla. 3d DCA 1977), this court addressed two separate questions presented by two policies of insurance. The holding was (1) damages caused by an assault and battery were not covered by a homeowner's liability policy, and (2) an insured could recover against his personal catastrophe policy for damages caused to another person, where the insured was obligated to pay, even though the damages were caused by the insured's intentional misconduct. This court in construing the second policy held that:
"[T]he [second] policy is a personal catastrophe insurance policy which covers the insured's legal obligation to pay damages for "personal injuries." "Personal injuries" are defined as including but not limited to "bodily injury" as well as a number of intentional torts which do not include assault and battery.
Spreen, 343 So.2d at 652. No such personal catastrophe policy is involved here.[4]
Everglades Marina, Inc. v. American East Development Corp., 374 So.2d 517 *950 (Fla. 1979), which the majority concedes is distinguishable on its holding, is more significantly distinguishable on the facts. In Everglades, Monroe Spodek, the president and sole stockholder of the Everglades Marina, intentionally and unlawfully set fire to his business premises. The fire caused damage to boats belonging to American Eastern and O'Donnell. It was unrefuted that Spodek did not intend to destroy the boats. The boat owners' insurers paid the claims and, as subrogees of the owners, brought a federal court action against the marina's insurer. The marina's insurer defended on grounds that public policy precluded indemnification to the insured for loss caused directly by his own misconduct, and that the boat owners stood in the shoes of the insured.
The two-part question certified to the supreme court by the United States Court of Appeals, Fifth Circuit, was:
A. Under Florida law, are damages intentionally caused by criminal acts of the insured excluded from the liability of [an insurer] under its insurance policy even though the policy contains no express clause excluding such liability?
B. [Assuming that] there is ... an exclusion of liability for damages intentionally caused by the criminal acts of [an] insured, are [unintended] damages that are the necessary and probable consequence of a criminal act of the insured, which is intended to cause an injury or loss otherwise covered by the insurance policy (i.e., to the building), excluded from coverage, where the insured knew or should have known that the additional damage would result from said act?
For the purpose of a response, the Florida Supreme Court rephrased the first part of the certified question:
Does the public policy as established by the laws of Florida prohibit third-party beneficiaries of an insurance policy from recovery of benefits because the loss was intentionally caused by criminal acts of the insured when the insurance policy contains no express clause excluding such liability?
As rephrased the question did not specifically address part two of the certified question. It is very clear, however, that the court did not intend to overturn a well-settled body of law that there can be no coverage under a liability insurance policy where a wrongful act of the insured, which causes injury to a third party, is both intentional and directed toward the party injured by the act. See Hartford Fire Ins. Co. v. Spreen; Isenhart v. General Casualty Co. of America, 233 Or. 49, 377 P.2d 26 (1962). Everglades is thus reconcilable with Hartford and Isenhart, where the courts recognized the distinction between wrongful acts of an insured which cause an intended harm and wrongful acts of an insured which cause an unintended harm. The distinction has been noted and honored in a long line of Florida cases which are cited in Hartford. See, e.g., Grange Mut. Casualty Co. v. Thomas, 301 So.2d 158 (Fla. 2d DCA 1974) (insured not liable under homeowners's liability policy unless the insured's wrongful act is intentionally directed toward person injured by the act); Cloud v. Shelby Mut. Ins. Co., 248 So.2d 217 (Fla. 3d DCA 1971) (coverage under liability policy not excluded as a matter of law where there was an intentional act but not an intentionally caused injury).
The discrimination cases cited by the majority which permitted enforcement against the insurer are easily distinguished. In those cases the acts of discrimination were based on disparate impact as distinguished from disparate individual treatment. In disparate impact cases it is held that there is no requirement to show discriminatory intent and in fact such specific intent may not exist. See, e.g., Solo Cup Co. v. Federal Ins. Co., 619 F.2d 1178 (7th Cir.) (liability insurer had duty to defend where, under a class action Title VII complaint, the Equal Employment Opportunity Commission could proceed on a disparate impact theory and the policy covering occurrences which unintentionally resulted in personal injury was interpreted to cover acts of discrimination), cert. denied, 449 U.S. 1033, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980); School Dist. No. 1, Multnomah County v. Mission Ins. Co., 58 Or. App. 692, 650 P.2d 929 *951 (1982) (under "errors and omissions" provision of general liability policy, insurer had duty to defend discrimination claims involving disparate impact but not disparate treatment), review denied, 294 Or. 682, 662 P.2d 725 (1983).
More recently the Supreme Court of Washington, after discussing some of the same cases we have considered, held that the insurer under a comprehensive general liability policy had not even the duty to defend on a complaint alleging acts of discrimination based on sex, race, age, or religion, where the specific acts occurred because of disparate treatment rather than disparate impact. E-Z Loader Boat Trailers, Inc. v. The Travelers Indemnity Co., 106 Wash.2d 901, 726 P.2d 439 (1986) (en banc). Public policy was relied upon for declaring the insurance contract unenforceable against the insurer.
The principal disagreement between the majority and dissenting views, as I understand it, is whether securing compensation to the victims of intentional discrimination, by shifting the obligation to the insurer, should override the public policy which seeks to place the risk of loss squarely on the shoulders of the wrongdoer as a penalty and a deterrent. There is direct and analogous authority for the view that a payment of an award to the victim is of secondary importance.
In New Amsterdam Casualty Co. v. Jones, 135 F.2d 191 (6th Cir.1943), the court stated the general rule that one cannot insure himself against his own intentional, illegal acts because such contracts are void as against public policy as set forth in that state's legislative acts and judicial pronouncements. In New Amsterdam the court examined the circumstances that would trigger the public policy, noting specifically that where the contract would have a tendency to encourage unlawful conduct it should not be enforced. New Amsterdam, 135 F.2d at 194.
An examination of the facts in New Amsterdam is helpful. Jones, an oil station proprietor, was insured by New Amsterdam for injuries suffered by any person not employed by him resulting from an accident on his premises. Jones shot and wounded Martin on the business premises during an altercation. Jones was convicted and served a sentence for willful and felonious assault. Thereafter Martin sued Jones for damages and was awarded a judgment. Martin then instituted garnishment proceedings against the insurer as provided for under Michigan law. The insurer brought an action in the district court for a declaratory judgment naming the victim, Martin, as a defendant and asserting its nonliability on grounds that the shooting, being intentional, was not an accident. The appellate court phrased the issues: (1) whether the intentional shooting of Martin was an accident within the meaning of the policy; (2) whether the insurance contract in question was void as against public policy; and (3) whether the company should be held liable for payment of damages for the injuries suffered. New Amsterdam, 135 F.2d at 193.
Significant to its holding that the insurance contract was not void for public policy reasons and that the insurer was liable were that (1) the insured did not institute the action to be indemnified for damages paid to the victim, and (2) the tortious act committed by the insured was not the kind that was likely to be encouraged if found covered by the policy. New Amsterdam, 135 F.2d at 195-96. The New Amsterdam court, like the majority, favored compensating the victim. But even the New Amsterdam, court would have invoked the public policy to deny enforcement of a liability policy  where a victim is injured by an intentional and unlawful act of the insured which causes an intended harm  if the prohibited conduct would otherwise be encouraged. The strong criminal sanction was considered an adequate deterrent.
This is not a case where injury resulted from an act or course of conduct which had a discriminatory impact without discriminatory intent. In this case, the intentional discrimination and harm was, apparently, a matter of longstanding policy which can and perhaps will continue, in one form or another, unless discouraged. Religious discrimination is not a crime so there are no *952 criminal sanctions which serve to deter the practice.
The punitive damages cases are analogous authority. In Northwestern Casualty Co. v. McNulty, 307 F.2d 432, 442 (5th Cir.1962) Judge Minor Wisdom wrote for the court:
[The victim's] interest in receiving noncompensatory damages is small compared with the public interest .. . and there is such a thing as a state policy to punish and deter by making the wrongdoer pay.
Other reasons given by the majority for making the obligation to pay the insurer's responsibility are: (1) protecting the tortfeasor from economic catastrophe; and (2) the marketplace forces are an adequate deterrence to intentional discrimination. Neither reason is, per se, a statement of public policy, but would, if given primary consideration, thoroughly nullify what is a clear public policy. Further, the cases which have extended coverage to acts of discrimination to protect the wrongdoer from economic catastrophe are cases of disparate impact where a practice, neutral on its face, incidentally resulted in discrimination against persons because of age, sex, or other improper distinction. See Solo Cup; School Dist. 1, Multnomah County. In none of the intentional discrimination cases we have found has the economic health of the wrongdoer been advanced as a reason for shifting to the insurer the obligation to pay.
In our view an insurer under a general liability insurance policy should not be obligated to pay for damages caused by an insured's intentional acts of discrimination which violate the Constitution, statutes, and a local ordinance where the non-criminal harm caused to the victims was specifically intended.
BARKDULL and DANIEL S. PEARSON, JJ., concur.
NOTES
[1] The precise issue we requested briefs on was, "whether the `public policy' of this state should prohibit the enforcement of an insurance contract covering damages arising from a tortious interference with a contract when the tortious interference involved amounts to intentional religious discrimination." Although this issue was never raised by the parties in the trial court or on appeal, we have discretion to review the matters because of the implications of constitutional ramifications raised by Judge Ferguson's dissent to the majority opinion. See Marinelli v. Weaver, 187 So.2d 690, 693-94 (Fla. 2d DCA 1966).
[2] Rehearing en banc was granted because the case is considered of exceptional importance. See Fla.R.App.P. 9.331(a).
[3] Courts addressing the issue have consistently held that it is not contrary to public policy to insure against damages resulting from an unintentional discrimination. See Solo Cup Co. v. Federal Ins. Co., 619 F.2d 1178 (7th Cir.), cert. denied, 449 U.S. 1033, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980); School Dist. No. 1, Multnomah County v. Mission Ins. Co., 58 Or. App. 692, 650 P.2d 929 (1982), review denied, 294 Or. 682, 662 P.2d 725 (1983). Our decision in the present case, by logical consistency, necessarily aligns us with this position.
[4] Obviously, all perpetrators of discrimination will not be sufficiently solvent to cover damages sustained by the victims of the discrimination. See Union Camp Corp. v. Continental Casualty Co., 452 F. Supp. 565, 568 (S.D.Ga. 1978) (recognizing this possibility and finding that insurance coverage for racially discriminatory employment practices is not against public policy).
[5] It has been argued that while innocent third parties should be able to enforce such provisions, insureds should not. Such a rule will simply discourage the insured from settling or satisfying the third party's claim, forcing the victim to recover from the insurer.
[6] We acknowledge that the claims involved in Union Camp were not limited to acts of intentional discrimination. Racially discriminatory employment practices are actionable in some instances even where there is no intention to discriminate (where the claim is no intention to disparate impact of an employment practice). See Solo Cup Co.; School Dist. No. 1. In Union Camp, the court indicated that the policy involved would not cover intentional or consensual acts of discrimination since such acts were excluded by the terms of the policy. 452 F. Supp. at 566, 568. Nevertheless, the court's findings and conclusions closely parallel this court's conclusions in the present case where the terms of the policy involved do not exclude coverage for intentional acts of discrimination.
[7] Additionally, absent insurance coverage, the victims of discrimination may be left with an uncollectible judgment and, thus, not fully compensated for the damages they sustained. See supra note 3 and accompanying text.
[1] See Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).
[2] E.g., 42 U.S.C. § 1982.
[3] E.g., Metropolitan Dade County Code, ch. 11, § 11A-3(1).
[4] The court did not consider or explain  perhaps because the question was not presented  whether the public policy, which prohibits enforcement of an insurance contract to cover unlawful acts committed with intent to cause a specific harm, should apply to a personal catastrophe insurance policy.