549 So.2d 1005 (1989)
RANGER INSURANCE COMPANY, Petitioner,
v.
BAL HARBOUR CLUB, INC., Respondent.
No. 70851.
Supreme Court of Florida.
August 31, 1989.
Rehearing Denied November 1, 1989.
Joe N. Unger of the Law Offices of Joe N. Unger, P.A., Miami, for petitioner.
James M. McCann, Jr. of Mershon, Sawyer, Johnston, Dunwody & Cole, Miami, for respondent.
SHAW, Justice.
We have for review Ranger Insurance Co. v. Bal Harbour Club, Inc., 509 So.2d 945 (Fla. 3d DCA 1987), in which the district court certified the following question:
Does the public policy of Florida prohibit an insured from being indemnified for a loss resulting from an intentional act of religious discrimination?
509 So.2d at 948. We have jurisdiction. Art. V, § 3(b)(4), Fla. Const. We answer the question in the affirmative and quash the decision of the district court.
Phil and Rona Skolnick contracted to purchase real property in the residential section of Bal Harbour in Dade County. The property at one time was subject to a deed *1006 restriction that prohibited occupation by anyone not a member of the Caucasian race or having more than one-fourth Hebrew or Syrian blood. Although the restriction expired by its own terms in 1968, the deed additionally provided that the seller could not convey the property to any person who was not a member of the Bal Harbour Club (the Club). The Skolnicks applied for membership in the Club and after their application was returned as "incomplete," they filed a complaint against the Club, alleging that the membership requirement was a sham to prevent Jewish persons from occupying the property. The Skolnicks alleged that the Club's failure to approve their application constituted a willful disregard of their rights and precluded them from obtaining good and marketable title. The Club called upon Ranger Insurance Company (Ranger) for coverage and defense of the suit pursuant to the Club's liability insurance policy. Ranger defended the action under a reservation of rights, questioning its obligation to provide coverage.
The lawsuit was settled, with the advice and consent of Ranger, by the Club paying $25,000 to the Skolnicks. Ranger refused to indemnify the Club for the amount of the settlement and sought a declaratory decree that no coverage existed under the policy. The Club filed a counterclaim for a determination of coverage and attorney's fees. After the parties stipulated that the trial court "could decide the coverage issue based solely upon the allegations of the complaint," the trial court entered final summary judgment in favor of the Club, ordered Ranger to pay the Club $25,000, and reserved jurisdiction to tax costs and attorney's fees. The judgment was affirmed on appeal. While Ranger's motion for rehearing was pending before the district court, the court directed the parties to file supplemental briefs on the issue of whether the public policy of the state should prohibit the enforcement of an insurance contract covering damages arising from intentional religious discrimination. On rehearing en banc, the district court concluded that the public policy did not preclude recovery and certified the above question.[1]
The Club asserts that the question should be answered in the negative for a number of reasons, including the following: private parties should be allowed to freely contract for coverage; such coverage should be encouraged so that the victims of discrimination can receive compensation for their injuries; indemnification for intentional wrongs is permitted under current case law; and the threat of punitive damages adequately deters discrimination. The Club, as did the district court, asserts that such coverage will not encourage intentional religious discrimination.
Unintentional discrimination is clearly a legitimate business risk and as such is insurable.[2] The bulk of cases allowing coverage for discriminatory acts are concerned with accidental or unintentional discrimination and do not address the issue of intentional discrimination. These cases provide no guidance for us here.[3] We note that the *1007 insurance departments of at least two states have prohibited insurance coverage for acts of intentional discrimination. See Willborn, Insurance, Public Policy, and Employment Discrimination, 66 Minn.L. Rev. 1003, 1005 n. 10 (1982).
In determining whether a particular policy of civil liability insurance is opposed to public policy, we look to two factors: the conduct of the insured (is it a type that will be encouraged by insurance?), and the purpose served by the imposition of liability for that conduct (is it to deter wrongdoers or compensate victims?). See Comment, Insurance Against Civil Liability for Employment Discrimination, 80 Colum.L. Rev. 192, 195-97 (1980). An examination of the first factor leads to the determination of whether the existence of insurance will directly stimulate commission of a wrongful act, and an examination of the second factor leads to the determination of whether deterrence or compensation should be given priority.

THE NATURE OF THE CONDUCT
It is axiomatic in the insurance industry that one should not be able to insure against one's own intentional misconduct. See, e.g., 12 J. Appleman & J. Appleman, Insurance Law and Practice § 7031 (1981); 9 G. Couch, Couch Cyclopedia of Insurance Law § 39.15 (1985). The rationale underlying this rule is that the availability of insurance will directly stimulate the intentional wrongdoer to violate the law.[4] Florida courts recognize this general rule and they have allowed exceptions only in individualized cases where innocent third parties were involved or it appeared unlikely that the wrongful act could have been produced by the prospect of coverage. See, e.g., Everglades Marina, Inc. v. American Eastern Dev. Corp., 374 So.2d 517 (Fla. 1979) (unplanned consequence of arson held insurable); Hartford Fire Ins. Co. v. Spreen, 343 So.2d 649 (Fla. 3d DCA 1977) (spontaneous assault and battery provoked by sexual comment concerning wife). See also Hussar v. Girard Life Inc. Co., 252 So.2d 374 (Fla. 2d DCA 1971) (no coverage for intentionally inflicted wounds). A blanket exception for intentional religious discrimination, as the Club and district court propose, clearly violates the rule.
In its opinion, the district court concluded that:
Contrary to Ranger's contentions, allowing insurance coverage for acts that amount to discrimination does not validate or encourage such actions any more than allowing coverage for other wrongful acts encourages those actions.
Ranger, 509 So.2d at 948. The district court's conclusion sweeps too broadly when it compares acts of intentional religious *1008 discrimination to other wrongful acts and finds them undistinguishable for purposes of liability coverage. Assault and battery, arson, and reckless and drunken driving are crimes and as such involve substantial deterrents independent of potential civil liability. Risk of personal injury is a further disincentive to the negligent, reckless, or drunken driver. Intentional religious discrimination, on the other hand, is not a crime, and no risk of injury exists to discourage the prejudiced from intentionally harming others by the exercise of their religious biases.
Both the Club and the district court indulge the supposition that making intentional religious discrimination insurable will not encourage such discrimination. This supposition is lacking in empirical support and defies human experience. The United States Court of Appeals, Seventh Circuit, had no difficulty in making the common sense connection between insurance and discrimination:
Once a person has insurance, he will take more risks than before because he bears less of the cost of his conduct. A person with insurance on his driving may take less care on the road. Insurance therefore tends to increase the likelihood that the insured risks will come to pass. Sometimes the increase is likely to be small  the driver is probably more interested in his own neck than in small increases in his financial liability. Other risks, however, could be affected more substantially. If an insurance policy were to cover a city's wilful racial discrimination, the people making policy for the city could indulge their own preference for discrimination at little risk to themselves. The city would pay in higher rates, but given the insurance each employee would be more likely to discriminate.
Western Casualty and Surety Co. v. Western World Ins. Co., 769 F.2d 381, 385 (7th Cir.1985).

DETERRENT vs. COMPENSATION
The second step in determining whether a particular type of liability insurance violates public policy is to examine the purpose that is served by the imposition of liability. If the primary purpose is to compensate victims, indemnification may be suitable. If, on the other hand, the primary purpose is to deter wrongdoers, then indemnification should not be the paramount consideration. We conclude that the primary purpose served by the imposition of liability for intentional acts of wrongful discrimination is to deter wrongful discrimination. Because of the unique nature of intentional discrimination, however, the two policies (compensation and deterrence) are not incompatible.
Florida has a long-standing policy of opposing religious discrimination. Article I, section 2 of the Florida Constitution provides:
Basic rights.  All natural persons are equal before the law and have inalienable rights, among which are the right to enjoy and defend life and liberty, to pursue happiness, to be rewarded for industry, and to acquire, possess and protect property; except that the ownership, inheritance, disposition and possession of real property by aliens ineligible for citizenship may be regulated or prohibited by law. No person shall be deprived of any right because of race, religion or physical handicap.

(Emphasis added.) Pursuant to this provision, the legislature has passed numerous laws banning religious discrimination in various practices.[5]
Intentional discrimination claims tried in Florida generally arise under the state's numerous antidiscrimination statutes, particularly *1009 under the Human Rights Act of 1977, sections 760.01-760.10, Florida Statutes (1987) (employment discrimination), and the Fair Housing Act, sections 760.20-760.37, Florida Statutes (1987).[6] The primary purpose for imposing liability under these acts is undeniably to deter discrimination. The Human Rights Act clearly states:
760.01 Purposes; construction; title. 
... .
(2) The general purposes of ss. 760.01-760.10 are to secure for all individuals within the state freedom from discrimination because of race, color, religion, sex, national origin, age, handicap, or marital status and thereby to protect their interest in personal dignity, to make available to the state their full productive capacities, to secure the state against domestic strife and unrest, to preserve the public safety, health, and general welfare, and to promote the interests, rights, and privileges of individuals within the state.
(Emphasis added.) And the Fair Housing Act provides:
760.21 State policy on fair housing.  It is the policy of this state to provide, within constitutional limitations, for fair housing throughout the state.
Whatever victim compensation takes place under these acts is secondary to deterring discrimination. Florida's Human Rights Act appears to be patterned after Title VII of the federal Civil Rights Act of 1964, and no doubt has ever existed as to the main purpose of the federal act:
This record, and its subsequent interpretation by the courts, leaves no doubt that the primary purpose of Title VII is to eliminate discrimination in employment and that its secondary purpose is to compensate victims of discrimination.
Comment, supra, at 197 (footnotes omitted).
The Club implies that if intentional discrimination were not to be held insurable many victims of discrimination would be unable to collect on their damage awards. We disagree. The bulk of discrimination cases are brought against commercial enterprises that have discriminated in the marketplace or workplace. These businesses generally have far greater resources than do individuals and to hold the acts of such parties uninsurable would result in relatively few instances where the injury would go uncompensated. Such was the case in the present claim.
As to the Club's claim that intentional discrimination is adequately deterred by the threat of punitive damages, we point out that to deter effectively, punishment must be reasonably certain. Punitive damages would appear to be awarded with insufficient frequency in statutory discrimination cases to make punishment certain by any means. In fact, punitive damages are not even mentioned under the state's premier antidiscrimination statute, the Human Rights Act. See §§ 760.01-760.10, Fla. Stat. (1987). Cf. Comment, supra, at 199 n. 46 (punitive damages are generally unavailable under Title VII). In private actions arising under Florida's Fair Housing Act, punitive damages are statutorily limited to no more than $1,000, a token wrist slap to a large corporate offender. § 760.35, Fla. Stat. (1987).
Based on the foregoing, we answer the certified question in the affirmative and quash the decision of the district court. In so doing, we hold that the public policy of Florida prohibits an insured from being indemnified for a loss resulting from an intentional act of religious discrimination. We remand for further proceedings consistent with this opinion.
It is so ordered.
OVERTON, BARKETT, GRIMES and KOGAN, JJ., concur.
*1010 EHRLICH, C.J., dissents with an opinion.
McDONALD, J., dissents.
EHRLICH, Chief Justice, dissenting.
The question at hand, simply put, is whether an insurance company which has issued a policy of insurance with a broad form comprehensive liability endorsement for which it was paid a premium commensurate with the risks insured against, can disclaim coverage after an insured has paid compensatory damages for intentional acts which are within the coverage insured against. The answer should be, and would be, a resounding NO, except for the fact that the intentional acts complained about are described as religious discrimination.
Religious discrimination is utterly anathema to me. As one who has been the target of such intentional discrimination, I can hardly be justly accused of seeking to encourage or perpetuate that most insidious conduct. By this dissent I neither subscribe to nor countenance religious bigotry.
To determine whether a particular policy of liability insurance is opposed to public policy, the majority says it looks to two factors: "the conduct of the insured (is it a type that will be encouraged by insurance?), and the purpose served by the imposition of liability for that conduct (is it to deter wrongdoers or compensate victims?)." Maj. op. at 1007.
First, as to the nature of the conduct. I quite agree that as a general rule one ought not to be able to insure against one's own intentional misconduct, and I would heartily welcome a declaration to that effect in the form of a statute by the constitutional body that establishes public policy in this state, the legislature. Generally speaking, policies of insurance have exclusions that eliminate such coverage, although an insurer is usually free to make a business decision in our free enterprise society to insure against the consequences of an insured's intentional acts, so long as such acts do not contravene a statute or lawful regulation.[1] I agree with the court below that allowing insurance coverage for acts that amount to discrimination does not validate or encourage such actions, for two very good reasons. First, there is always the likelihood that an adverse judgment as the result of a civil suit will exceed the limits of coverage. Second, and perhaps more important, intentional religious discrimination resulting in injury and damage to another will inevitably provide a factual basis for a punitive damage claim,[2] as it did in the instant suit. Because punitive damages are excluded from insurance coverage, the likelihood of incurring a substantial award for punitive damages can hardly encourage this type of conduct. I think it is preeminently reasonable to conclude, based on good business and common sense and everyday experience, that intentional religious discrimination will not be encouraged by the fact of insurance.
Now, as to deterrence versus compensation. The primary purpose of liability insurance is to protect the insured from the economic consequences of his or her own conduct or misconduct. The motivation is self financial protection. However, the courts have looked beyond this self-motivation and have made the injured or damaged party a third-party beneficiary. See, e.g., Beta Eta House Corp. v. Gregory, 237 So.2d 163 (Fla. 1970); Shingleton v. Bussey, *1011 223 So.2d 713 (Fla. 1969). From the point of view of the insured, protection is the primary function of insurance. From the standpoint of the victim, insurance affords financial responsibility. Both of these are respected, desired consequences of insurance in our society. Thus perceived, liability insurance always serves a twofold purpose, to protect the insured and to provide financial responsibility for the victim.
The majority "conclude[s] that the primary purpose served by the imposition of liability for intentional acts of wrongful discrimination is to deter wrongful discrimination." Maj. op. at 1008. With this I respectfully disagree. Our society by both case law and statute imposes liability for unintentional, that is, negligent acts, as well as for intentional acts in order to make the innocent injured or damaged party whole. The imposition of liability for the consequences of either negligent or intentional misconduct does by its very nature have a deterrent effect because of the financial consequences of such misconduct, namely, it costs the wrongdoer money when he injures another either negligently or intentionally. To say that the primary purpose of the imposition of liability is to deter wrongdoers is unreal in this world of ours. To the extent that liability causes one to pay damages it is indeed a deterrent, but the deterrent effect is secondary not primary. I do agree that the deterrent effect of having to pay money for misconduct is lessened to the extent that such misconduct can be covered by insurance. But as I mentioned earlier, even with insurance, the potential for a judgment in excess of insurance coverage is always present and the potential for being hit with a judgment for punitive damages, which cannot be covered by insurance, for intentional misconduct is always a likelihood, and it is these factors, in my opinion, which are real world deterrents of misconduct, the presence of insurance or not.
From the ORDER GRANTING SUMMARY JUDGMENT TO DEFENDANT [BAL HARBOUR CLUB, INC.] AND FINAL SUMMARY JUDGMENT, we learn:
3... . The Skolniks alleged that they purchased real property in the Bal Harbour subdivision and were not admitted into the Bal Harbour Club, Inc. due to restrictions in the by-laws of the Club. The Skolniks sought ten million dollars in damages for loss of use of their real property and for mental anguish and embarrassment in Count I, and sought declaratory relief in Count II.
... .
5. The Ranger policy covered the Club for all liability from claims of loss of use of tangible property arising from "incidental contracts". Such contracts are defined by the policy as "any oral or written contract or agreement relating to the conduct of the named insured's business," and include, under Florida law, the by-laws of the Club. From the allegations of the Complaint, it appears that the Club was covered for the claims of damages in Count I.
6. The Ranger policy also covered the Club for all liability from claims of personal injury, defined as all claims arising out of "wrongful entry or eviction or other invasion of the right of private occupancy." The Skolniks' claims in Count I arise out of an invasion of the right of private occupancy and, therefore, fall within the coverage of the policy.
7. Ranger raised two defenses to coverage. First, that the Skolniks' claim does not meet the Policy's definition of an "occurrence". Second, that the claim arose out of the willful violation of a penal statute. The Court finds that neither defense is applicable. Reading the "occurrence" requirement in light of the language of the Broad Form Comprehensive Endorsement, the Court finds that the allegations of loss of use of property and the mental anguish alleged to have been suffered by the Skolniks falls within the policy provisions. Although Count II of the Skolniks' complaint seeks a determination whether the Club's by-laws are violative of Chapter 11A, Article I of the Dade County Code, Count II does not specifically allege a violation of the statute, nor seek damages for any *1012 violation. The Court finds that the exclusion of coverage to injuries arising out of the willful violation of a penal statute is inapplicable to coverage in this case under the wording of the complaint.
The claim of intentional religious discrimination which is the subject of this suit manifested itself in the business conduct described in the above quotes from the final judgment. We are dealing with business conduct that does not fall within the purview of a statutory regulation. We are dealing with commercial conduct that may not be violative of a law, but is nonetheless conduct that should not be countenanced.
The majority's opinion cites a large number of statutes banning religious discrimination in various practices. I heartily applaud the wisdom of such enlightened legislation. It is proper that if one violates one of the statutes and causes damage or injury to another, he or she should be held liable for compensatory damages to make the victim whole, and here again, the violator may very well expose himself or herself to the imposition of punitive damages, depending upon the statute. But the truth of the matter is that it is not possible to obtain insurance covering such statutorily proscribed conduct, and that is not what this suit is all about.
It is my considered judgment that the two-step analysis that the majority sets forth provides it with neither the valid reasoning nor the judicial underpinnings to support its answer to the certified question. Permitting insurance coverage in the factual setting provided in this case can under no stretch of the judicial imagination encourage religious discrimination.[3] The threat of a verdict in excess of insurance coverage and the very real likelihood of punitive damages for intentional religious discrimination will provide a deterrence in our contemporary commercial world.
In answer to the question certified, I would respond by saying that under the facts as presented there was coverage and the insured should be indemnified. I would approve the ruling of the trial court and the decision of the court below. The question posed more properly belongs in the legislative arena. The legislature is the governmental body best suited to resolve the competing considerations implicated in deciding whether the public policy of Florida should prohibit an insured from being indemnified for a loss resulting from an intentional act of religious discrimination. I respectfully dissent.
NOTES
[1] The public policy issue in the certified question was neither raised in nor decided by the trial court and was not an issue urged by Ranger before the original panel of the district court. A panel of the district court originally affirmed the trial court's order granting summary judgment in favor of the Bal Harbour Club on the basis that the claim fell within the personal injury liability coverage of the policy and no exclusions applied. Ranger Ins. Co. v. Bal Harbour Club, Inc., 509 So.2d 940, 944 (Fla. 3d DCA 1985).
[2] Courts generally have characterized the terms "disparate impact" and "disparate treatment," which arise primarily in employment discrimination claims, as referring to unintentional and intentional discrimination respectively. See, e.g., E-Z Loader Boat Trailers, Inc. v. Travelers Indemnity Co., 106 Wash.2d 901, 726 P.2d 439 (1986).
[3] No reported case has been brought to our attention that has directly addressed the issue of whether insurance coverage for intentional discrimination by a private or corporate entity violates public policy. Several have expressly avoided the issue. See, e.g., Solo Cup Co. v. Federal Ins. Co., 619 F.2d 1178 (7th Cir.), cert. denied, 449 U.S. 1033, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980); City of Greensboro v. Reserve Ins. Co., 70 N.C. App. 651, 321 S.E.2d 232 (Ct.App. 1984); School Dist. Number 1 v. Mission Ins. Co., 58 Or. App. 692, 650 P.2d 929 (Ct.App. 1982), review denied, 294 Or. 682, 662 P.2d 725 (1983). One has indicated disapproval of the practice in dicta. E-Z Loader Boat Trailers, 726 P.2d at 445 ("We decline to expand contracts to cover discrimination committed intentionally."). Another has approved the practice for public officials in dicta. Harris v. County of Racine, 512 F. Supp. 1273, 1280 (E.D.Wis. 1981) ("it is not an unreasonable construction of the policy to hold that it insures against intentional acts of discrimination by an employee acting under color of state law rather than in a purely private capacity"). Others are ambiguous. See, e.g., Western Casualty & Surety Co. v. Western World Ins. Co., 769 F.2d 381 (7th Cir.1985); Gardner v. Romano, 688 F. Supp. 489 (E.D.Wis. 1988).
[4] The idea is that only those wrongful acts are excluded from insurance coverage that may be consciously produced by the availability of insurance. For instance, an employer or club may determine that without insurance its discriminatory purpose does not outweigh its possible liability, but with the protection offered by insurance the employer or club may decide that the purpose outweighs the liability. Insurance in such a case directly stimulates commission of the wrongful act. Alternatively, an employer may decide to discriminate without even considering the availability of insurance. Such an intentional act cannot be said to be encouraged by insurability. The group of deliberate wrongful acts that may be encouraged by insurability is thus a subset of the broader group of intentional acts. Yet, because in most cases it is impossible to determine whether the perpetrator consciously considered insurability as a factor in making its decision to act wrongfully, the proscription is necessarily applied to all intentional wrongful acts that are not impulsive or that do not produce unintended results. See generally Willborn, Insurance, Public Policy, and Employment Discrimination, 66 Minn.L.Rev. 1003 (1982) (no coverage where "calculating intent" to discriminate shown); Comment, Insurance Against Civil Liability for Employment Discrimination, 80 Colum.L.Rev. 192 (1980) (no coverage except where "good faith" effort to avoid discrimination shown).
[5] See, e.g., §§ 110.105, 110.233 (in state employment); § 112.042 (in county and municipal employment); § 229.8021 (in Dept. of Educ.); § 237.40 (in district school boards); § 240.364 (in community colleges); §§ 258.015, 267.17 (in citizen support organizations); § 286.011 (in public meetings); §§ 395.031-395.032 (in trauma centers); §§ 509.092, 509.141, and 509.142 (in public lodging and restaurants); § 513.118 (in RV parks); § 562.51 (in bars); § 641.3102 (in HMOs); chapter 760 (in housing); § 760.10 (in employment); § 849.093 (in public games); § 871.04 (in advertising).
[6] Cf. Ranger Ins. Co. v. Bal Harbour Club, Inc., 509 So.2d 945, 948 (Fla. 3d DCA 1987) (More than 70,000 claims of employment discrimination were filed with the federal Equal Employment Opportunity Commission in 1983. This does not include claims alleging discrimination in housing, health services, and access to public facilities.).
[1] Ranger argues that intentional religious discrimination is violative of the public policy of Florida and therefore it should not be required, or even permitted, to indemnify the Club. There are, however, other competing public policies in Florida which may be weighed against a public policy which would prohibit indemnifying a perpetrator of intentional religious discrimination. Two such policies are the policy which favors freedom of contract and the policy which favors the enforcement of insurance contracts according to their terms. In the present case, Ranger had equal or greater bargaining power with regard to the terms and provisions of the policy. The policy issued to the Club is very detailed, setting forth many exclusions from coverage. Ranger could easily have included a provision excluding coverage for the conduct at issue.
[2] The majority opinion glaringly fails to discuss the deterrent effect of a claim for punitive damages for acts of intentional religious discrimination.
[3] In support, I would cite that libel and slander are intentional acts for which insurance coverage can be obtained in the marketplace. The majority's porous analysis would have us believe that this encourages libel and slander. If this were true, there would be empirical data to support their assertion, but the fact is that there is none.