[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-14844
_____

D.C. Docket No. 0:16-cv-62168-MGC

PHILADELPHIA INDEMNITY INSURANCE COMPANY,
a foreign Corporation,

Plaintiff-Counter Defendant-Appellee,

versus

SABAL INSURANCE GROUP, INC.,
a foreign Corporation,
IAN MARSHALL NORRIS,

Defendants-Counter Claimants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(August 26, 2019)

Before MARCUS, BLACK, and WALKER,* Circuit Judges.

_____

* John M. Walker, Jr., United States Circuit Judge for the Second Circuit, sitting by
designation.

WALKER, Circuit Judge:

This appeal concerns a Directors & Officers liability insurance policy (the "Policy") that Defendants-Counterclaim Plaintiffs-Appellants Sabal Insurance Group, Inc. ("Sabal Insurance Group") purchased from Plaintiff-Counterclaim Defendant-Appellee Philadelphia Indemnity Insurance Company ("PIIC"). Following an investigation by the Miami-Dade County Office of the Inspector General regarding the business dealings of Sabal Insurance Group and its President and CEO Ian M. Norris ("Norris" and together with Sabal Insurance Group, "Sabal"), Norris was arrested, and Norris and Sabal Insurance Group were charged with grand theft. Norris and Sabal Insurance Group settled the charges with the State of Florida pursuant to a Stipulated Settlement Agreement ("SSA"), in which they agreed to make various payments to the alleged victim and other entities. Thereafter, Sabal claimed indemnification for these payments from PIIC under the Policy. PIIC denied coverage, and then filed a declaratory judgment action against Sabal. Sabal answered and counterclaimed on the basis that PIIC breached the Policy by refusing to indemnify Sabal. The parties then cross-moved for summary judgment, and on September 28, 2017, the district court (Marcia G. Cooke, *Judge*) granted PIIC's motion for summary judgment and denied Sabal's motion for summary judgment. Sabal has appealed, arguing that the district court erred in its

2

disposition of both motions for summary judgment.  For the reasons set forth below, we AFFIRM the judgment of the district court.

## I.    BACKGROUND

We begin by setting out the relevant provisions of the Policy, the facts pertaining to the charges against Sabal, the facts of Sabal's claim under the Policy, and the procedural history of this case.

### A. Relevant Provisions of the Policy

The Policy requires that PIIC pay "**Loss** from **Claims**" for "**D&O Wrongful Acts**" while the Policy is in effect.  App'x at 38.  A "**D&O Wrongful Act**" includes "any actual or alleged . . . act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by" the insured. App'x at 38.  A "**Claim**" includes "a criminal proceeding commenced by a return of an indictment."  App'x at 44.  There is no dispute that the criminal proceeding at issue in this case qualifies as a Claim under the Policy.

"**Loss**" includes "**Damages**" and "**Defense Costs**," but does not include, among other things, "matters deemed uninsurable under the law to which this Policy shall be construed" or "criminal or civil fines or penalties imposed by law." App'x at 46.  The Policy also includes the following exclusion:

> The **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A. arising out of, based upon or attributable to such **Insured** gaining any profit, remuneration or advantage to which they were not legally entitled; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission;

B. arising out of, based upon or attributable to any dishonest or fraudulent act or omission or any criminal act or omission by such **Insured**; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission.

App'x at 48.  The parties do not dispute that the amounts at issue in this case are either Damages or Defense Costs under the Policy but do dispute whether one or more of these exclusions applies.

B.  The Charges Against Sabal

Like PIIC, Sabal is an insurance agency, and it provided a workers' compensation and general liability insurance policy to Quality Aircraft Services ("QAS"), paid for by the Miami-Dade Aviation Department ("MDAD").  MDAD was concerned that it was being overcharged by Sabal, and it initiated an investigation, which was carried out by the Miami-Dade County Office of the Inspector General over the course of thirty months.  Following the investigation, Norris was arrested, and Norris and Sabal Insurance Group were charged with grand theft under a five-count information.  Under the alleged scheme, Sabal overcharged QAS/MDAD by creating invoices with fraudulently inflated premiums.  PIIC alleges that the investigation determined that Sabal fraudulently

4

obtained over $416,000; however, the amount obtained within the statute of limitations was $180,807.87.  Sabal Insurance Group and Norris settled the charges with the State of Florida in the SSA, which required Sabal Insurance Group and/or Norris to make the following three payments:

> 1.     **Payment** to Miami Dade County Aviation Department in the amount of $183,807.87
>
> 2.     A **Donation** payable to the Denise Moon Memorial Fund at The Miami Foundation in the amount of $100,000.00.  Both Sabal and IAN MARSHALL NORRIS stipulate that neither will claim this money as a charitable deduction on any income tax return.
>
> 3.     **Costs of Investigation** payable to the Miami-Dade County Aviation Department in the amount of $20,000.00

App'x at 103.  We refer to these payments as the "Payment to MDAD," the "Donation," and the "Costs of Investigation," respectively.

### C. The Claim

On September 23, 2014, Sabal notified PIIC that it had received a subpoena from the Miami-Dade State Attorney's Office.  In response, on October 15, 2014, PIIC issued a reservation of rights letter accepting the subpoena as a Claim under the Policy and reserving its rights under the Policy.  Sabal then received and notified PIIC of a second subpoena, and on November 3, 2014, PIIC issued a second reservation of rights letter accepting the second subpoena as a Claim under the policy and reserving its rights under the Policy.  On January 13, 2015, PIIC

5

issued an updated reservation of rights letter advising Sabal that PIIC deemed the criminal information that had been filed to relate back to the Claim originally commenced by the subpoenas and reserving its rights under the Policy. PIIC funded Sabal's defense, and throughout 2015 responded to several questions from Sabal regarding coverage under the Policy. In November 2015, Sabal's defense counsel asked whether PIIC would agree to indemnify Sabal for any payment to Florida of the money it was accused of stealing. PIIC responded that it would not indemnify Sabal for such payments for various reasons, including that restitution is not damages but a criminal sanction and was therefore not a covered Loss under the Policy.

On February 19, 2016, Sabal's counsel sent PIIC the proposed final SSA and asked PIIC to advise within one business day whether it had any objections to the proposed agreement or would request any changes. PIIC responded that it was not prepared to review the agreement and advise as to coverage in that timeframe but agreed not to object to the settlement on the basis that PIIC failed to provide its consent to the settlement, as required by the Policy. On March 10, 2016, PIIC issued a "Denial of Indemnity Coverage" letter to Sabal refusing to indemnify Sabal for the payments made pursuant to the SSA.

D. Procedural History

PIIC filed a declaratory judgment action against Sabal in the district court for the Southern District of Florida asserting that it was not obligated to indemnify Sabal under the Policy for the payments Sabal made under the SSA. Sabal answered with affirmative defenses of waiver and estoppel and counterclaimed that PIIC breached the Policy by refusing to indemnify Sabal. After the parties cross-moved for summary judgment, the district court, on September 28, 2017, granted PIIC's motion for summary judgment and denied Sabal's motion for summary judgment. This appeal followed.

## II.    DISCUSSION

On appeal, Sabal argues that the district court erred in: (i) granting PIIC's motion for summary judgment on its declaratory claim that the Policy does not obligate it to indemnify Sabal for the payments it made under the SSA, (ii) denying Sabal's motion for summary judgment on its breach of contract counterclaim, and (iii) granting PIIC's motion for summary judgment regarding Sabal's affirmative defenses. For the reasons set forth below, we affirm the district court's grant of PIIC's motion for summary judgment and denial of Sabal's motion for summary judgment.

7

A. Standard of Review

We review *de novo* the district court's decision to grant one party's motion for summary judgment and to deny the other party's motion for summary judgment. *Boardman Petrol., Inc. v. Federated Mut. Ins. Co.*, 135 F.3d 750, 752 (11th Cir. 1998). In doing so, we "consider all facts and reasonable inferences in favor of the nonmoving party, and apply the same legal standards used by the district court." *Galindo v. ARI Mut. Ins. Co.*, 203 F.3d 771, 774 (11th Cir. 2000). "Summary judgment properly is granted when the evidence before the district judge shows that there is no genuine issue concerning any material fact and that the moving party is entitled to judgment as a matter of law." *Id.*

"The interpretation of an insurance contract is also a matter of law subject to *de novo* review." *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1515 (11th Cir. 1997). In a diversity action, we apply the substantive law of the forum state, *id.* (citing *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938)), which in this case is Florida. In this regard, we are not limited to the law as stated by Florida's Supreme Court. "Absent a decision by the highest state court or persuasive indication that it would decide the issue differently, federal courts follow decisions of intermediate appellate courts in applying state law." *Galindo*, 203 F.3d at 775.

8

B.  Indemnification for Amounts Paid Pursuant to the SSA

The district court concluded that the payments made by Sabal pursuant to the SSA are not collectively a covered Loss under the Policy because, (i) as a matter of Florida law, insurance contracts do not insure the restitution of ill-gotten gains, and (ii) the payments made by Sabal under the SSA are "clearly restitutionary in nature."  *Philadelphia Indem. Ins. Co. v. Sabal Ins. Grp., Inc.*, No. 16-62168-CIV, 2017 WL 4310700, at \*4 (S.D. Fla. Sept. 28, 2017).  On appeal, Sabal challenges both conclusions.  While we agree with the district court's reasoning regarding the Payment to MDAD and the Costs of Investigation, we affirm the district court's conclusion that the Donation is not a covered Loss under the Policy based on different reasoning.  We address each of these payments in turn.

i.  Payment to MDAD

1.  Coverage of the Restitution of Ill-Gotten Gains

The first issue is whether, as matter of Florida law, an insurance contract excludes the restitution of ill-gotten gains.  The district court concluded that it does, citing to an unpublished Eleventh Circuit opinion, *CNL Hotels & Resorts, Inc. v. Twin City Fire Ins. Co.*, 291 F. App'x. 220 (11th Cir. 2008) (unpublished opinion).  *CNL Hotels* addressed whether an insurance policy covered payments made to settle disputes between a company and its shareholders following a

9

corporate merger involving the company.  *Id.* at 222.  In that case, we concluded that "loss" under an insurance contract does not include the restitution of ill-gotten gains and that "[t]he return of money received through a violation of law, even if the actions of the recipient were innocent, constitutes a restitutionary payment, not a 'loss.'"  *Id.* at 223.  We reach the same conclusion in this case.

"It is axiomatic in the insurance industry that one should not be able to insure against one's own intentional misconduct," and Florida courts recognize exceptions to this general rule "only in individualized cases where innocent third parties were involved or it appeared unlikely that the wrongful act could have been produced by the prospect of coverage."  *Ranger Ins. Co. v. Bal Harbour Club, Inc.*, 549 So. 2d 1005, 1007 (Fla. 1989).  In this case, the payments by Sabal were made to resolve alleged intentional misconduct, and it is likely that the prospect of coverage under the Policy would have tended to encourage the alleged wrongful act.

Sabal nevertheless argues that Florida law permits insurance contracts to cover restitution, and points to *Mitchel v. Cigna Prop. & Cas. Ins. Co.*, 625 So. 2d 862, 863 (Fla. Dist. Ct. App. 1993).  In that case, the Third District Court of Appeal concluded that the insurance contract at issue did cover a restitution payment imposed as part of the settlement of criminal charges.  *Id.* 863–65. *Mitchel* is factually distinguishable from the present case, however, because it dealt

with restitution in the form of compensation for damage the insured caused to a coral reef with his boat, not the restitution of ill-gotten gains. *Id.* at 863. *Mitchel* also therefore does not run afoul of the axiom stated in *Ranger*.

Public policy considerations also counsel against interpreting the Policy as covering the restitution of ill-gotten gains. As described by the Florida Supreme Court, when "determining whether a particular policy of civil liability insurance is opposed to public policy, we look to two factors: the conduct of the insured (is it a type that will be encouraged by insurance?), and the purpose served by the imposition of liability for that conduct (is it to deter wrongdoers or compensate victims?)." *Ranger*, 549 So. 2d at 1007. "An examination of the first factor leads to the determination of whether the existence of insurance will directly stimulate commission of a wrongful act, and an examination of the second factor leads to the determination of whether deterrence or compensation should be given priority." *Id.*

In this case, the first factor favors excluding coverage, because extending coverage under an insurance contract to the restitution of ill-gotten gains could encourage commission of a wrongful act. The second factor also favors excluding coverage, because excluding coverage would deter wrongdoing, while allowing coverage would only compensate the wrongdoer. Public policy considerations, therefore, reinforce the axiom that "one should not be able to insure against one's

11

own intentional misconduct," *id.*, and together compel our conclusion that insurance contracts are not, as a matter of Florida law, permitted to insure the restitution of ill-gotten gains.

Sabal next argues that even if the restitution of ill-gotten gains cannot be insured under Florida law, under this Policy a payment is only the restitution of ill-gotten gains if it is determined to be so by a final and non-appealable judgment or adjudication. In other words, Sabal argues that we must read the Policy's exclusionary provision into the coverage provision, either because the two provisions must be considered *in pari materia* or because if the exclusionary provision is not read into the coverage provision, it would make the coverage provision superfluous. Neither argument has merit.

As a threshold matter, we agree with the district court's refusal to read the exclusionary provision into the coverage provision on the basis that "Florida law clearly states that an exclusionary provision does not apply unless there is coverage in the first instance." *Philadelphia Indem. Ins. Co.*, 2017 WL 4310700, at *5. Without coverage there is nothing from which to exclude. "This statement of the law is undeniable—the existence or nonexistence of an exclusionary provision in an insurance contract is not at all relevant until it has been concluded that the policy provides coverage for the insured's claimed loss." *Siegle v. Progressive Consumers Ins. Co.*, 819 So. 2d 732, 740 (Fla. 2002). In this case, because the

12

policy does not provide coverage for the restitution of ill-gotten gains, there is no need to look to the exclusionary provision. Sabal argues that the district court's reliance on *Siegle* was misplaced because the policy in that case did not include an exclusion to be read in the context of the entire contract, and therefore its rule only applies to contracts that do not have an exclusionary provision. But *Siegle* states a general legal principle, not a statement of law limited to specific facts.

Regarding Sabal's argument that the coverage and exclusionary provisions should be read together, Sabal is correct that "[a]lthough exclusionary clauses cannot be relied upon to create coverage, principles governing the construction of insurance contracts dictate that when construing an insurance policy to determine coverage the pertinent provisions should be read *in pari materia*." *State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So. 2d 1072, 1074–75 (Fla. 1998) (citations, internal quotation marks, and brackets omitted). However, "courts generally apply *in pari materia* only when a legal text is ambiguous." *United States v. Warren*, 820 F.3d 406, 408 (11th Cir. 2016). Here, the coverage provision is unambiguous, so there is no need to turn to other sections of the Policy to interpret it. In addition, Sabal's reading of the coverage provision would add a condition that is not included in the plain language of the Policy. "When an insurance contract is not ambiguous, it must be given effect as written." *Siegle*, 819 So. 2d at 735.

13

Sabal's argument that the coverage provision would be superfluous if it is not considered together with the exclusionary provision is equally without merit. In making this argument, Sabal relies on a district court decision from Minnesota: *U.S. Bank Nat. Ass'n v. Indian Harbor Ins. Co.*, 68 F. Supp. 3d 1044 (D. Minn. 2014). That court was persuaded that if it interpreted the exclusionary provision regarding matters uninsurable under the law as precluding coverage for a payment based on a settlement resolving claims for restitution, "it would nullify the Ill-Gotten Gains Provision that precludes coverage for a payment based only on a final adjudication determining that the claims warrant restitution. So to interpret the two provisions consistently, the Court must read the Uninsurable Provision to bar coverage for a payment that a final adjudication in the underlying action determined is restitution." *Id.* at 1050. We are unpersuaded. Although "'in construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect,'" *U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 877 (Fla. 2007) (quoting *Auto–Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000)), these two provisions are not duplicative because there could be circumstances in which the claim is deemed uninsurable by law but the insured has not committed a criminal act.

14

For these reasons, we agree with the district court in this case that, as a matter of Florida law, insurance contracts do not insure the restitution of ill-gotten gains. Sabal's arguments to the contrary are unavailing.

### 2. Whether the Payment to MDAD is Restitution

The second issue we must consider is whether the $183,807.87 Payment to MDAD is the restitution of ill-gotten gains. We conclude that it is.

In support of its argument that the payment under the SSA is not restitution, Sabal points to the following facts. Under the SSA, the State of Florida agreed to "**nolle prose [sic] all charges** contained in the Information" as to Norris and Sabal Insurance Group. App'x at 103. The SSA also stated that the parties "are aware of the risks of litigation and the chances of success or failure, and desire to settle all charges in the Information now pending and to end all charges in the Information," App'x at 102, and that Sabal's payments would be made "[w]ithout there being any admission of guilt by either Norris or Sabal [Insurance Group] and solely for purposes of compromise and case resolution." App'x at 103. The district court dismissed these statements by citing our unpublished decision in *CNL Hotels* for the proposition that the SSA "is not binding on any third party or this Court," *Philadelphia Indem. Ins. Co.*, 2017 WL 4310700, at *4 (citing *CNL Hotels*, 291 F. App'x. at 224), and concluded that the payment was "clearly restitutionary in nature," *id.* at *5.

15

"The word 'restitution' is generally understood as being synonymous with 'restoration' and 'indemnification.'" *J.O.S. v. State*, 668 So. 2d 1082, 1085 (Fla. Dist. Ct. App. 1996), *approved*, 689 So. 2d 1061 (Fla. 1997). "[T]he purpose of [criminal] restitution is twofold (1) to compensate the victim and (2) to serve the rehabilitative, deterrent, and retributive goals of the criminal justice system." *Kirby v. State*, 863 So. 2d 238, 242 (Fla. 2003). "For [criminal] restitution to be deemed reasonable, it must bear a significant relationship to the convicted offense. A factor in determining whether a significant relationship exists is whether there is a causal connection between the criminal conduct and the loss claimed by the victim." *L.H. v. State*, 803 So. 2d 862, 863 (Fla. Dist. Ct. App. 2002) (internal citations omitted).

With these standards in mind, we agree with the district court that the Payment to MDAD is restitution. It was made to resolve a criminal information charging Sabal with grand theft, and the amount of the Payment to MDAD is equal to the amount of Sabal's alleged ill-gotten gains that accrued within the statute of limitations. It is clear to us from the language of the SSA and the surrounding circumstances that the purpose of the Payment to MDAD is to make MDAD whole for losses that accrued within the statute of limitations period. The provisions of the SSA in which Sabal did not admit guilt are irrelevant, because the admission of guilt is not required for a payment to be the return of ill-gotten gains.

16

On appeal, Sabal argues that Eleventh Circuit case law does not support the proposition that an unproven allegation constitutes an uninsurable claim. Sabal first points to *Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1455 (11th Cir. 1989), for the proposition that "[w]ithout a finding that the gains were in fact ill-gotten, the insurer could not deny coverage or disclaim the loss." Appellant's Br. at 37. But this statement does not appear in the opinion. And *Johns* did not address the restitution of ill-gotten gains, but rather the question of whether money paid to executives under a golden parachute was corporate waste. 874 F.2d at 1450. Sabal next cites *Limelight Prods., Inc. v. Limelight Studios, Inc.*, 60 F.3d 767 (11th Cir. 1995), arguing that the case stands for the proposition that "damages" under an insurance policy includes ill-gotten profits. *Limelight* is also factually distinguishable. That case considered recovery of ill-gotten profits under the Lanham Act, which are "the presumed equivalent of plaintiff's own lost profits" and therefore "merely another form of damages that the statute permits to be presumed because of the proof unavailability in these actions." *Id.* at 769.

Sabal also makes a policy argument that settlements are favored under Florida law, implying that settlements will be discouraged if we find the payments under the SSA to be restitution. Although the District of Minnesota was convinced by this argument, *U.S. Bank*, 68 F. Supp. 3d at 1050, we agree with the Seventh Circuit that it "can't be right" that if a case is settled before an entry of judgment,

17

"the insured is covered regardless of the nature of the claim against it." *Level 3 Commc'ns, Inc. v. Federal Ins. Co.*, 272 F.3d 908, 911 (7th Cir. 2001). Doing so would create an artificial distinction between parties who have settled criminal cases and parties who have not, and would allow wrongdoers to recoup the proceeds of their wrongdoing simply by entering into a settlement agreement. *See id.* at 911–12.

For these reasons, we agree with the district court that the payment to MDAD under the SSA is the restitution of ill-gotten gains and therefore not a Loss that is covered by the Policy.

### ii. Donation

Without discussing the issue, the district court also considered the Donation under the SSA to be restitution. The Donation does not restore any ill-gotten gains, however. It was paid to a third-party charitable foundation, rather than the victim of Sabal's alleged crime. In addition, the amount of the Donation, $100,000, does not have a clear connection to the $235,192.13 that Sabal allegedly stole beyond the statute of limitations period. For these reasons, the Donation is not restitution.

Nevertheless, we agree that the Donation is not a covered Loss under the Policy. Loss under the Policy also excludes "criminal or civil fines or penalties imposed by law," and the Donation is such a penalty. App'x at 46. Under Florida

law, "a penalty or fine involves punishment which is *not* designed to effect compensation for or restoration of the damages caused by a specific act." *Mitchel*, 625 So. 2d at 864. Unlike damages, "[a] penalty need have no causal connection with the wrong inflicted. In a penal statute the penalty is inflicted by a law for its violation." *Hyman v. State, Dep't of Bus. Regulation, Div. of Pari-Mutuel Wagering*, 431 So. 2d 603, 605 (Fla. Dist. Ct. App. 1983) (quoting *Porter v. Montgomery*, 163 F.2d 211, 215 (3d Cir. 1947) (internal quotation marks omitted)). Therefore, "a remedial provision designed to effect restitution rather than to punish and deter wrongdoing is not a penalty." *Id.* at 605. Viewed in this light, the Donation is plainly a penalty. Although the parties call this payment a "Donation," it is neither voluntary nor tax deductible.

Sabal argues that the Donation cannot be a "fine or penalty imposed by law" because only the judiciary can order criminal restitution and the criminal charges in this case were not adjudicated. This distinction is immaterial. The SSA was entered into between Sabal and the State of Florida, explicitly for the purpose of resolving felony charges, and was "accepted and ratified" by the court. App'x at 109. Therefore, the Donation that was imposed by the SSA is a penalty imposed by law.

19

iii.  Costs of Investigation

Unlike the Donation, we agree with the district court that the Costs of Investigation in the amount of $20,000 is restitution.  The Costs of Investigation was paid to MDAD, the alleged victim, even though the investigation was conducted by the Miami-Dade County Office of the Inspector General, not MDAD.  In addition, the notation on Sabal's check for the Costs of Investigation indicates that this amount, like the Payment to MDAD, is a "settlement."  App'x at 115.  For the same reasons that the Payment to MDAD is not a covered Loss under the Policy, the Costs of Investigation is not a covered Loss under the Policy.

C.  Sabal's Breach of Contract Counterclaim

The district court denied Sabal's motion for summary judgment on its breach of contract counterclaim because a breach of contract cause of action requires "that there actually be coverage under the Policy."  *Philadelphia Indem. Ins. Co.*, 2017 WL 4310700, at *6.  On appeal, Sabal argues that the district court erred in granting summary judgment to PIIC on Sabal's breach of contract claim because the Policy "unambiguously covers indemnification for the payments made to settle the State's action."  Appellant's Br. at 47.  However, because we reject Sabal's argument that these payments are covered under the Policy, we agree with the district court that Sabal's breach of contract claim fails.

20

D. Sabal's Affirmative Defenses

Finally, Sabal argues that the district court erred in granting summary judgment to PIIC on Sabal's affirmative defenses because disputed issues of material fact remain. Specifically, Sabal argues that "there is a factual dispute as to whether PIIC is estopped to deny coverage, waived its right to deny coverage or otherwise ratified the terms of the Stipulated Settlement Agreement." Appellant's Br. at 48.

This alleged factual dispute revolves around an email exchange between Sabal and PIIC regarding the SSA. On February 19, 2016, Sabal's counsel sent PIIC's counsel a draft version of the SSA, requested that PIIC advise "whether PIIC sees anything objectionable or requests any changes" and stated that "Mr. Norris asked that I pass on to you his request that PIIC, based upon Mr. Norris's review of the applicable policy, fund the payments to be made by Sabal referenced in paragraph 2(d) of the proposed agreement." App'x at 398. PIIC's counsel responded on the same day as follows:

> Congratulations on the nolle prose [sic]. The settlement agreement arrived at 2:47 pm Friday and you are looking for a response by early afternoon one business day later. PIIC is not prepared to review this and advise as to coverage in that time frame. PIIC will agree not to interpose any objection to the document or to the amounts agreed to be paid on the basis that PIIC's written consent to the settlement was not obtained. (Part 6, section III B) Otherwise we will review it as soon as reasonably possible and advise.

21

> Further to our review please forward all revisions and versions of the agreement as referenced below. We will likely have questions concerning the settlement.

App'x at 406. Sabal's counsel then responded: "My time sensitive inquiry is not requesting a coverage opinion; only seeking objections to terms. The separate inquiry as to coverage by Mr. Norris should be addressed with Mr. Norris and should not hold up settlement on Tuesday. Two different issues." App'x at 408.

Although Sabal and PIIC cite two different sources in the record for this email exchange, the text is the same in both. Thus, there is no disputed issue of fact. Rather, the dispute is a legal question of whether this email exchange constitutes an agreement by PIIC "not to object to the use of the document to resolve the underlying case, or to object to the amounts agreed to be paid." Appellant's Br. at 48. But the plain language of PIIC's email shows that it is not such an agreement. PIIC agreed not to "interpose any objection" only "on the basis that PIIC's written consent to the settlement was not obtained" and explicitly stated that it could not "advise as to coverage." App'x at 406. That coverage was not implicated by PIIC's response was confirmed by Sabal's reply. Therefore, there is no factual dispute regarding the waiver and estoppel defenses, and the district court did not err in finding otherwise.

E. Conclusion

For these reasons, we AFFIRM the district court's grant of PIIC's motion for summary judgment and its denial of Sabal's motion for summary judgment.

**AFFIRMED.**